[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 117 
There was no controversy as to the nature of the accident, or how it occurred, which caused the loss of the plaintiff's horses. On the Friday preceding the downward trip of the defendant's steamer a sloop had been sunk, in a squall of wind, near Buttermilk Falls, and about in the usual route on the downward passage of steamboats navigating the river. The defendant's steamer ran upon the mast of this sunken vessel, which stove in her bottom, and she was cast away, and sunk in the water to her promenade deck in consequence. The defendant assumed this to be an inevitable accident, against which he could not have guarded by the exercise of due diligence and precaution; and, as matter of law, that it excused him from liability as a carrier. This presents one of the two questions raised by the exceptions in the case.
The law adjudges the carrier responsible, irrespective of any question of negligence or fault on his part, if the loss does not occur by the act of God or the public enemies. With these exceptions, the carrier is an insurer against all losses. The expressions "act of God" and "inevitable accident" have sometimes been used in a similar sense, and as equivalent terms. But there is a distinction. That may be an "inevitable accident" which no foresight or precaution of the carrier could prevent; but the phrase "act of God" denotes natural accidents that could not happen by the intervention of man — as storms, lightning, and tempest. The expression excludes all human agency. In the case of the Trent Proprietors v. Wood (4 Douglass, 287), Lord Mansfield said: "The general principle is clear. The act of God is natural necessity — as winds and storms — which arise from natural causes, and is distinct from inevitable *Page 118 
accident." The same judge, in Forward v. Pittard (1 Term Rep. 27), defined the "act of God" to be something in opposition to the act of man — adding "that the law presumes against the carrier, unless he shows it was done by such an act as could not happen by the intervention of man — as storms, lightning, and tempest."
Another principle running through the case is, that to excuse the carrier the act of God must be the sole and immediate cause of the loss. That it is the remote cause is not enough. This is illustrated in the case of Smith v. Shepherd reported in Abbot on Shipping (part 3, ch. 4, § 1); and McArthur v. Sears
(21 Wend. 190). In neither of the cases was the loss occasioned directly by natural violence, although a sudden and extraordinary flood in the one case, and a light on board a steamer which had grounded in a previous gale of wind in the other, were the remote causes. In Smith v. Shepherd, the vessel was lost by striking a floating mast attached to a vessel which had been sunk by getting on a bank that had suddenly and unexpectedly been made dangerous by an extraordinary flood. Coming in contact with the mast attached to the sunken ship, the defendant's vessel was forced by it upon the bank, altered suddenly by the flood, and was wrecked. The flood which changed the bank was the ultimate occasion of the misfortune; but it was held to be too remote. The vessel had not been forced on the bank by winds or other extraordinary violence of nature, or without human interference. The immediate cause of the loss was the coming in collision with a floating mast which some person had attached to the sunken vessel. In McArthur v. Sears, the vessel was lost in attempting to enter port by mistaking a light on board of a steamer which had grounded in a previous gale of wind for one of two beacon lights of the port. One of the beacon lights, through some neglect, was not burning, and the light on board of the wrecked steamer was easily mistaken for it. It was a dark night, the snow was falling, *Page 119 
and there was a considerable wind. The mistake occasioned the loss of the vessel without any fault of her master or crew, yet it was held that the carrier was not excused.
In the present case the sinking of the defendant's vessel was not directly caused by the act of God. The immediate cause was her running upon the mast of a sloop that had been sunk in a squall of wind a day or two previously. She was not forced upon the mast which stove in her bottom by the wind or current, and although the sloop may have been sunk by the violence of the wind, yet that was but the remote cause of the loss of the defendant's steamer. The case of Smith v. Shepherd, in its circumstances, closely resembles the present one. In that case the defendant's vessel ran against a floating mast attached to a vessel which had been sunk by getting on a bank suddenly changed and made dangerous by a flood, and was forced by the mast upon the changed bank and wrecked, In this case the defendant's vessel ran against the mast of a sloop that had been sunk in a sudden and violent squall of wind. In the former case, the changing of the bank was the "act of God," as spoken of in the law of carriers. So in this case the sinking of the sloop was occasioned by what may be properly called the "act of God." But neither the changing of the bank by the flood, nor the sinking of the sloop by the sudden and violent squall, was alone the cause of the loss of the defendant's vessel. Human agency intervened in the one case, by attaching to the sunken vessel the floating mast with which the lost vessel came in contact; and in this other, by placing the sloop in the position in which she was overtaken by the wind. All the cases agree that by the expression "act of God," is meant something which operates without any aid or interference from man; and when the loss is occasioned, or is the result in any degree of human aid or interference, the case does not fall within the exception to the carrier's liability. I am of the opinion, therefore, that had the defendant shown that the plaintiff's loss was occasioned *Page 120 
by an accident, against which he could not have guarded by the exercise of due diligence and precaution, it would not have absolved him from his responsibility as a carrier.
The horses were put on board the defendant's steamer for transportation, on Sunday, the freight paid and a receipt taken. The defendant's second point was that he was discharged from liability on the ground that the contract to carry the horses was in violation of the statute respecting the observance of Sunday. (1 R.S. 575, 676.) There is no force in the suggestion. Even if the contract were for the performance of servile labor, there was nothing in it which required the defendant to transport or commence the transportation on Sunday; and notwithstanding, the horses were taken on board on Sunday, he was at liberty to detain the vessel at her dock until Monday morning. A contract made on Sunday is not void, and to invalidate a transaction under the statute, the contract must necessarily require the act to be performed on Sunday. (Boynton v. Page, 13 Wend. 425; Watts
v. Van Ness, 1 Hill, 76.) However, if it was expected that the transaction was to begin on Sunday, it was not to be completed until Monday. But it is not material whether the contract made was good or bad: it was enough to entitle the plaintiff to recover, that the defendant being a common carrier, had in his custody for transportation the plaintiff's property, and by his negligence or in violation of duty, it was lost. This gave the plaintiff a right of action, wholly disconnected from the statute relating to the observance of Sunday. (Allen v. Sewall, 2 Wend. 338.) The judgment of the supreme court should beaffirmed.